UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
    :
    :
ANEGADA MASTER FUND, LTD., TONGA    :
PARTNERS L.P.; ENDICOTT PARTNERS, L.P.,    :
ENDICOTT PARTNERS II, L.P., ENDICOTT    :
OFFSHORE INVESTORS, LTD., ENGINEERS JOINT    :
PENSION PLAN & TRUST, INTERNATIONAL    :
BANCSHARES CORPORATION EMPLOYEES    :   Case No. 08 CV 10584 (RJS)
PROFIT SHARING PLAN & TRUST, EHL    :
ENDICOTT LIMITED, ROYAL CAPITAL VALUE    :
FUND, LP, ROYAL CAPITAL VALUE FUND (QP),    :
LP, ROYALCAP VALUE FUND, LTD., SENECA    :
CAPITAL LP, SCOPIA PARTNERS LLC, SCOPIA    :
PARTNERS QP LLC, SCOPIA PX LLC, SCOPIA    :
LONG LLC, SCOPIA INTERNATIONAL LIMITED,    :
SCOPIA PX INTERNATIONAL LIMITED and THE    :
COAST FUND L.P.,    :
    :
                Plaintiffs,    :
    :
      vs.    :
    :
PXRE GROUP LTD., ARGO GROUP    :
INTERNATIONAL HOLDINGS, LTD., JEFFREY L.    :
RADKE, GUY D. HENGESBAUGH and JOHN M.    :
MODIN,    :
    :
                Defendants.    :
    :
---------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................. 1

Summary Of Allegations .............................................................................................. 3

      A.     The Private Placement ........................................................................ 3

      B.     October 5, 2005 Public Stock Offering Prospectus ................................... 4

      C.     September 8, 2004—October 5, 2005: Various Alleged Interactions Between The Individual Defendants And The Plaintiffs .......................... 5

Argument ...................................................................................................................... 5

    I.     The Complaint Fails To Plead Any Violation Of Section 12(a)(2) Of The '33 Act ............................................................................................................ 5

      A.     The Private Placement Interests Were Not Securities Subject To The '33 Act Sold By A Prospectus .................................................................. 5

      B.     The PPM Did Not Contain Actionable Untrue Statements ..................... 8

              1.     The PPM's Preliminary Katrina Loss Estimates Were Not Misstatements ................................................................... 9

              2.     The PPM Properly Disclosed The Company's Loss Estimating Methodology ................................................... 11

              3.     The PPM's Statement Concerning Limitations On The Company's Obligation To Pay Claims Was Not a Misstatement ..................................................................... 12

      C.     The Complaint Fails To Allege Facts Giving Rise To A Strong Inference Of Scienter With Respect To The '33 Act Claim .................... 12

      D.     The Alleged Misstatements Are Protected By The Common Law Doctrine Of "Bespeaks Caution" ............................................................. 13

    II.    Plaintiffs Fail To State Any '33 Act Claims Against The Individual Defendants ....................................................................................................... 14

    III.    The Complaint Fails To Allege Common Law Fraud ........................................ 15

      A.     Oral Statements Concerning The Maximum Loss Exposure "Formula" Are Not Actionable .............................................................. 15

1.      None Of The Alleged Statements Concerning The Maximum Loss Exposure "Formula" Were False ........................................ 16

2.      The Complaint Fails To Allege Scienter Concerning The Maximum Loss Exposure "Formula"........................................... 17

3.      The Complaint Fails To Plead Reasonable Reliance Concerning The Maximum Loss Exposure "Formula"................ 17

B.      Statements Concerning PXRE's Losses From The Gulf Hurricanes Are Not Actionable ................................................................... 18

1.      None Of The Alleged Misstatements Concerning The Gulf Hurricanes Were False ............................................................. 19

2.      The Complaint Fails To Allege Scienter Concerning Statements Relating To The Gulf Hurricanes .............................. 20

3.      The Complaint Fails To Allege Reasonable Reliance On Statements Relating To The Gulf Hurricanes .............................. 20

C.      Statements Concerning The Impact Of A Ratings Agency Downgrade Are Not Actionable ................................................................... 20

D.      Statements Concerning PXRE's Business Prospects Are Not Actionable ............................................................................. 21

IV.     The Complaint Fails To Plead A Claim For Negligent Misrepresentation .......... 22

A.      Plaintiffs' Negligent Misrepresentation Claims Are Preempted By The Martin Act ........................................................................ 22

B.      The Complaint Fails To Plead Any False Statement Of Existing Fact .... 23

C.      The Complaint Fails To Plead Any False Statement That Defendants Knew Or Should Have Known Was Incorrect ........................................ 24

D.      The Complaint Fails To Plead Any Fiduciary Relationship Between Plaintiffs And Defendants ..................................................... 24

E.      The Complaint Fails To Allege Reasonable Reliance ............................ 25

Conclusion ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*AAL High Yield Bond Fund v. Ruttenberg*, No. 00-c-1404-s, 2001 U.S. Dist. LEXIS 25572 (N.D. Ala. Sept. 30, 2001) ................................................................. 8

*ATSI Commc'ns, Inc. v. The Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................... 3

*Baena v. Woori Bank*, 515 F. Supp. 2d 414 (S.D.N.Y. 2007) ..................................... 13

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146 (2d Cir. 1995)...................................................................................... 24

*Coronel v. Quanta,* No. 07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) .................................................................................................................9, 14, 16

*DeMaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) .................................... 14

*Ederer v. Gursky*, 35 A.D. 3d 166 (1st Dep't 2006) .................................................. 20

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) .............................................................................................. 23, 25

*Glamorgan Coal Corp. v. Ratner's Group PLC*, No. 93 Civ. 7581, 1995 WL 406167 (S.D.N.Y. July 10, 1995)....................................................................... 6, 7

*Glassman v. Catli*, 111 A.D.2d 744 (2d Dep't 1985)................................................. 21

*Heller v. Goldin*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) ........................................... 22

*Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523 (S.D.N.Y. 2007) ............. 23, 24

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) ................................ 23

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004)...................................... 9

*In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580 (S.D.N.Y. 2005)................................................. 5

*In re FBR*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................................... 21

*In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004) .............................. 8

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................................................................... 14

*In Re PXRE*, No. 06 Civ. 3410 (RJS), 2009 WL 539864 (S.D.N.Y. Mar. 4, 2009) .............. 10, 13

*In re QLT Sec. Litig.,* 312 F. Supp. 2d 526 (S.D.N.Y. 2004) ..................................................... 17

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................................... 6, 7

*In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) ....................... 16, 19

*In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 431 (S.D.N.Y. 2003) .............................. 6, 7, 8

*Kimmell v. Schaefer*, 89 N.Y.2d 257 (1st Dep't 1996) ................................................................ 25

*Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976, 2008 WL 4449280
    (S.D.N.Y. Sept. 30, 2008) ....................................................................................... 8, 12, 14

*Matsumura v. Benihana Nat. Corp.*, 542 F. Supp. 2d 245 (S.D.N.Y. 2008) ....................... 16, 19

*Meyercord v. Curry*, 38 A.D.3d 315 (1st Dep't 2007) ................................................................ 15

*Mia Shoes, Inc. v. Republic Factors Corp.*, No. 96 Civ. 7974, 1997 WL 525401
    (S.D.N.Y. Aug. 21, 1997) ................................................................................................. 24

*Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 2008 WL 3842899 (2d Cir. 2008) ..................... 24

*Nairobi Holdings, Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230, 2004
    WL 1124660 (S.D.N.Y. May 20, 2004) ............................................................................ 15

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) .............................................. 13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................... 12, 21

*Scibelli v. Roth*, No. 98 Civ. 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ........................ 10

*SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953) ......................................................................... 7

*Sedona Corp. v. Landenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2005 WL
    1902780 (S.D.N.Y. Aug. 9, 2005) .................................................................................... 23

*Seow Lin v. Interactive Brokers Group*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................... 13

*Shanahan v. Vallat*, No. 03 Civ. 3496(MBM), 2004 WL 2937805 (S.D.N.Y. Dec.
    19, 2004) ............................................................................................................................. 7

*Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72 (1st Dep't 2000) .............................................. 23

*Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43 (N.Y. 1999) .............................................. 15

*State v. Samaritan Asset Mgmt Servs., Inc.*, 874 N.Y.S.2d 698 (N.Y. Sup. Ct.
    2008) .................................................................................................................................. 22

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) .................................................................................... 5

*Zirkin v. Quanta*, No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...................................................................................................9, 12, 14, 16

## <u>STATUTES</u>

15 U.S.C. § 77 l(a)(2) ........................................................................................ 5

15 U.S.C. § 77d(2).............................................................................................. 6

15 U.S.C. § 77m ............................................................................................... 14

Rule 9(b) ....................................................................................................12, 14, 24

Martin Act, N.Y. Gen. Bus. Law § 352 *et seq* ...................................................22, 23

## <u>RULES</u>

Federal Rule of Civil Procedure 9(b) ......................................................12, 13, 15, 24

Defendants PXRE Group Ltd., Argo Group International Holdings (collectively, "PXRE" or the "Company"), and Individual Defendants Jeffrey L. Radke, Guy D. Hengesbaugh and John M. Modin respectfully submit this memorandum of law and the affidavit of John C. Briody in support of their motion to dismiss Plaintiffs' Amended Complaint (the "Complaint" attached as Ex. A[1]).

## PRELIMINARY STATEMENT

The Complaint in this case tries mightily to distinguish itself from the complaint in *In re PXRE Group Ltd. Securities Litigation* (the "Class Case" or the "PSAC") by purporting to assert different causes of action and citing alleged oral misstatements. At bottom, however, there is nothing new. The core allegations here are substantially similar to the allegations this Court dismissed in the Class Case. The ultimate result should be the same: two of the three claims (Section 12 and negligent misrepresentation) are barred by statute, and the other (fraud) should be dismissed, as in the Class Case, because of a failure adequately to plead scienter.

Plaintiffs are a group of hedge funds that sought to invest in PXRE in the aftermath of the unprecedented destruction of Hurricane Katrina. Their claims revolve around alleged material misstatements concerning PXRE's loss estimates for Hurricanes Katrina and Rita (the "Gulf Hurricanes") made prior to the time Plaintiffs elected to participate in a private placement of Series D Perpetual Non-Voting Preferred PXRE Stock (the "Private Placement"). The Private Placement closed on October 7, 2005. Plaintiffs' claims, therefore, concern a very narrow window of time that ended at most less than six weeks after Katrina's landfall, and less than three weeks after Rita.

---

[1]     All references to "Ex." refer to documents attached to the Briody Affidavit.

**1933 Act Claims:**  The Complaint alleges federal securities claims pursuant to Section 12(a)(2) of the Securities Exchange Act of 1933 (the "'33 Act") based upon a Private Placement Memorandum ("PPM").  Such claims, however, are improperly pled because the '33 Act does not apply to private placements.  Moreover, even assuming that the '33 Act did apply, the Section 12 claim still fails because the PPM did not contain any misstatements.  The Complaint does not identify any untrue statement in the PPM, nor does it plead any misleading omission of material fact.  The Complaint pleads no facts establishing that, as of the September 28, 2005 date of the PPM, Defendants were aware that PXRE's loss estimates were inaccurate or that there were any flaws in the Company's loss estimating methodology.  The Complaint also fails to allege facts giving rise to a strong inference of scienter, which it must do because even Plaintiffs' purported Section 12 claim is based upon allegations of fraud.  Here, the Court's ruling in the Class Case is directly on point.  The Complaint's scienter allegations are similar in nature to but far weaker than the insufficient scienter allegations of the PSAC.  Any alleged misstatements in the PPM are also protected by the "bespeaks caution" doctrine.  Finally, all '33 Act claims against the Individual Defendants are time-barred.

**Common Law Fraud:**  The Complaint's central "new" allegation is that the Individual Defendants misled Plaintiffs during various conversations by providing a generic "formula" that could be used to calculate the Company's prospective loss exposure from any one catastrophe.  The Complaint, however, does not plead any facts suggesting that at the time the Individual Defendants discussed the "formula" with Plaintiffs they knew, or had any reason to know, that the "formula" was defective.  Indeed, if the formula were applied, it would suggest loss estimates in line with PXRE's anticipated losses from Hurricane Katrina.  Moreover, Plaintiffs cannot claim that they were misled by the "formula" because the PPM specifically

cautioned that typical loss maximums might be exceeded as a result of Katrina.  The Complaint's additional allegations concerning the oral misrepresentations are likewise lacking, generally for the same reasons set forth in this Court's order dismissing the Class Case.

       **Negligent Misrepresentation:**  Plaintiffs' negligent misrepresentation claim is preempted by the Martin Act.  Even placing that threshold issue aside, the negligent misrepresentation claim should be dismissed because the Complaint fails to allege facts suggesting that the Defendants made any false statement, or that any alleged false statement was negligently made.  The Complaint also fails adequately to allege reasonable reliance or the existence of a "special" or "fiduciary" relationship between Plaintiffs and Defendants.

## SUMMARY OF ALLEGATIONS[2]

**A.**      **The Private Placement**

       The Complaint alleges that on October 7, 2005 PXRE announced the completion of a Private Placement of 375,000 Series D Perpetual Preferred Shares and the sale of 8,843,500 shares of common stock.  (Compl. ¶¶ 8, 46.)  The Complaint further alleges that the Series D preferred shares were mandatorily exchangeable for common stock on December 12, 2005 upon the affirmative vote of the Company's existing shareholders.  (*Id.* ¶¶ 9, 48.)

       Plaintiffs allege that they were provided a PPM dated September 28, 2005, only four days after Hurricane Rita's landfall.  (*Id.* ¶¶ 24, 40.)[3]  The PPM explained that PXRE sold property catastrophe reinsurance "on an excess-of-loss basis with aggregate limits on our

---

[2]      We do not repeat many of the allegations in the Complaint that are substantially similar to those contained in the PSAC and that were summarized in the Court's Order in the Class Case.

[3]      This Court may properly consider on this motion the full text of documents selectively quoted in the Complaint as well as "documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. The Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

exposure to losses," thereby limiting PXRE's obligation to pay claims "to a specific aggregate amount."  (PPM, Ex. B at 1.)  The PPM stated that PXRE's estimated range of potential losses from Katrina was $235-$300 million.  (*Id.*)  This same estimate was contained in PXRE's press releases dated September 19, 2005 and September 28, 2005.  (Exs. C, D.)  The PPM, like PXRE's public disclosures, explained that PXRE's Katrina loss estimates were "based on insured industry loss estimates in the range of $30 billion to $40 billion," and advised that "the estimates were based mainly on modeling, a review of exposed reinsurance contracts and discussions with certain clients."  (PPM at 1.)  The PPM did not provide a specific loss estimate for Rita, stating only that "net losses related to Hurricane Rita will be substantially less then our estimated losses from Hurricane Katrina."  (*Id.* at 2.)  The PPM contained a number of strongly worded disclaimers concerning the uncertainty of the loss estimates, including:

- [O]ur estimates are subject to a high level of uncertainty arising out of extremely complex and unique causation and coverage issues, including the appropriate attribution of losses to flood as opposed to other perils such as wind, fire or riot and civil commotion.  The underlying policies generally contain exclusions for flood damage; however, water damage caused by wind may be covered.  We expect that causation and coverage issues may not be resolved for a considerable period of time and may be influenced by evolving legal and regulatory developments.  (Id. at 2, 19.)

- **We may be overexposed to losses in certain geographic areas for certain types of catastrophe events. . . . [N]o assurance can be given that [maximum tolerable losses from a single event or multiple catastrophic events] will not be exceeded by actual losses resulting from Katrina or by some future catastrophe.**  (Id. at 21 (emphasis in original).)

The PPM also advised of the adverse impact of a credit rating downgrade by Standard & Poor Ratings Services ("S&P") or A.M. Best Company ("A.M. Best").  (*Id.*)

**B.      October 5, 2005 Public Stock Offering Prospectus**

On October 5, 2005 PXRE issued a Prospectus, (the "Prospectus," Ex. E), in connection with its separate public offering of 8,843,500 shares of common stock (the

"Secondary Offering").  As alleged in the Complaint, the Prospectus contained similar

statements concerning PXRE's exposure to Katrina and Rita to those contained in the PPM.

(Compl. ¶¶ 51, 53, 56.)   The Cannell Funds allegedly executed the documents with respect to

the Private Placement before the Prospectus was issued.  (*Id.* ¶¶ 8, 109.)

### C.     September 8, 2004—October 5, 2005: Various Alleged Interactions Between The Individual Defendants And The Plaintiffs

The Complaint alleges that the Individual Defendants made materially false and

misleading oral statements to certain Plaintiffs (other than the Coast Funds).  The alleged oral

misstatements (not all, of course, allegedly uttered to all Plaintiffs or by all defendants)

essentially concerned four topics: (1) a "formula" for calculating PXRE's loss exposure from any

one catastrophic event; (2) the Company's exposure to the Gulf Hurricanes; (3) the potential

impact of a ratings agency downgrade; and (4) the Company's business prospects.

## ARGUMENT

### I.     The Complaint Fails To Plead Any Violation Of Section 12(a)(2) Of The '33 Act

Plaintiffs' Section 12(a)(2) claims are solely predicated upon the PPM.  (Compl.

¶¶ 65, 145-50.)  In order to allege a violation of Section 12(a)(2), the Complaint must plead that

a security subject to the '33 Act was offered or sold by means of a prospectus that included

untrue statements of material fact or misleadingly omitted a material fact.  15 U.S.C. § 77 l(a)(2);

*In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005).  The Complaint fails to

plead any of the elements necessary to support a Section 12(a)(2) claim.

### A.     The Private Placement Interests Were Not Securities Subject To The '33 Act Sold By A Prospectus

Private transactions that are not marketed via a prospectus are exempt from the

disclosure requirements of the '33 Act.  *See Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005); 15

U.S.C. § 77d(2).  The Complaint is clear that the Private Placement was a private offering, repeatedly alleging that Plaintiffs "purchased $[x] million . . . of the Private Placement" (Compl. ¶¶ 8, 78, 89, 110, 125), and referencing statements contained in the PPM.  (*Id.* ¶¶ 48, 49, 52, 55, 62.)  The Complaint never suggests that Defendants marketed the Private Placement to them via the Prospectus, but rather states that the Private Placement was marketed via the PPM only.  (*Id.* ¶¶ 8, 65.)  The PPM unambiguously confirms on its first page that the Private Placement was exempt from the '33 Act's registration requirements:

> The Series D Perpetual Non-Voting Preferred Shares . . . of PXRE Group Ltd. . . . are being offered to a limited number of qualified institutional buyers, as defined in Rule 144A . . . and have not been and, as except otherwise set forth herein, will not be, registered under the Securities Act . . . The Perpetual Preferred Share are being offered in reliance upon the exemption from registration provided by Section 4(2) of the Securities Act.

(PPM at i; *see also* PPM at ii-iii.)  This case is therefore very similar to *In re WorldCom, Inc. Securities Litigation,* where the court found:

> The fact that the December 2000 Offering was a private placement is clear from its face. . . . The first page of the Offering Memorandum explains that the notes are being offered only "to qualified institution buyers . . . and [ ] to non-U.S. persons outside the United States in reliance on Regulation S.". . .
>
> [The Complaint's] limited allegations confirm that the transaction was a private placement. . . . It consistently describes the document disseminated in connection with the [] transaction as an "offering memorandum," not as a prospectus. . .

294 F. Supp. 2d 431, 454-55 (S.D.N.Y. 2003) (quoting *Glamorgan Coal Corp. v. Ratner's Group PLC*, No. 93 Civ. 7581, 1995 WL 406167, at *2-3 (S.D.N.Y. July 10, 1995)); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 626-27 (S.D.N.Y. 2007).

The Complaint pleads that the Private Placement was an extension of PXRE's common stock offering because PXRE's ability to offer stock was allegedly limited by the

Company's shelf registration statement.  (Compl. ¶ 7.)  The Complaint also pleads that the

Private Placement was "'private' in name only" and "was contingent upon the completion of the

Secondary Offering and included a mandatory exchange of preferred shares for common shares

on December 12, 2005."  *(Id.* ¶ 9; *see also id.* ¶¶ 46, 48.)  These allegations are not sufficient to

change the character of the Private Placement.  As the *Worldcom* Court explained:

> The terms of the Offering Memorandum compel the conclusion
> that the December 2000 Offering was a private placement, and
> allegations in the proposed amendments to the Complaint which
> contradict the Offering Memorandum (as well as the Complaint)
> are ineffective to convert it into a public offering subject to Section
> 12(a)(2).  As the *Glamorgan* court found when it was confronted
> with a similar effort at amendment to escape dismissal, "no matter
> how the plaintiff might word the claim, the document involved
> cannot be silkenized into a § 12(a)(2) 'prospectus.'"

294 F. Supp. 2d at 455 (citing *Glamorgan*, 1995 WL 406167 at *3) (emphasis added); *see also*

*Refco*, 503 F. Supp. 2d at 625-28.

Allegations concerning the reasons why PXRE elected to raise capital through the

Private Placement are completely irrelevant.  The question ultimately "turn[s] on whether the

particular class of persons affected need the protection of the Act.  An offering to those who are

shown to be able to fend for themselves is a transaction not involving any public offering."  *SEC*

*v. Ralston Purina Co.,* 346 U.S. 119, 125 (1953) (internal quotation marks omitted).  To the

extent courts even look beyond the face of the PPM, some examine the manner of the offering,

the number of offerees, their sophistication, and the information provided to them or to which

they had access.  *See Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *7

(S.D.N.Y. Dec. 19, 2004).

In addition to the text of the PPM itself, the Complaint's allegations

overwhelmingly demonstrate that the offering was private.  The Complaint alleges that Plaintiffs

are "sophisticated investors" that sought out Defendants to inquire about investment

opportunities.  (Compl. ¶¶ 43, 93.)  Plaintiffs had direct access to the Individual Defendants and

discussed the Private Placement with them.  (*E.g., id.* ¶¶ 76, 87, 96, 98.)  Moreover, the

Complaint concedes that the Private Placement and the Secondary Offering involved different

classes of securities and were marketed pursuant to different sets of materials—the Private

Placement and the Prospectus.  (*Id.* ¶ 8.)  Plaintiffs were well aware that the transaction was

private, more than capable of fending for themselves and did not need the protections that

registration affords.  *See Worldcom*, 294 F. Supp. 2d at 455.

       In their pre-motion letter, Plaintiffs referenced a decision of an Alabama District

Court.  *See AAL High Yield Bond Fund v. Ruttenberg*, No. 00-c-1404-s, 2001 U.S. Dist. LEXIS

25572, at *26 (N.D. Ala. Sept. 30, 2001).  That case is obviously not binding precedent and, in

any event, is distinguishable.  The *Ruttenberg* plaintiffs alleged that defendants sold notes

pursuant to an "offering memorandum" and marketed the notes via a road show to more than 200

mutual funds and other investors.  *Id.* at *8-9.  The district court denied defendants' motion to

dismiss because the parties had "introduced contravening evidence" concerning whether the

offering was private.  *Id.* at *21, 26.  There are no similar allegations of road shows and

widespread marketing here.  Rather, the Complaint alleges that Plaintiffs are sophisticated

investors that came to PXRE seeking an opportunity.  (Compl. ¶¶ 43, 93.)

    **B.**    **The PPM Did Not Contain Actionable Untrue Statements**

       The "truth of a statement made in the prospectus is adjudged by the facts as they

existed when the registration statement became effective."  *In re Initial Pub. Offering Sec. Litig.*,

358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004); *see also Ladmen Partners, Inc. v. Globalstar, Inc.*,

No. 07 Civ. 0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008).  The Complaint

identifies three categories of alleged material misstatements or omissions in the PPM: (1)

PXRE's preliminary Katrina loss estimates; (2) the Company's loss estimating methodology; and

(3) the extent of the Company's obligation to pay claims.  None of these statements is actionable.

### 1. The PPM's Preliminary Katrina Loss Estimates Were Not Misstatements

The Complaint essentially alleges that the loss estimates related to Katrina[4]

contained in the PPM were false and misleading because they were later revised and Defendants

should have gotten them right the first time.  This District's recent decisions in *Coronel v.*

*Quanta* and *Zirkin v. Quanta*, however, make clear that such allegations are insufficient to plead

falsity.  No. 07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009); No. 07 Civ. 1405

(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009).  Those cases also involved Section 12(a)(2)

claims based upon a reinsurance company's alleged understatement of losses attributable to

Katrina.  The Court explained that the "relevant inquiry . . . is not whether the estimate disclosed

. . . later turned out to be correct, but rather whether the facts alleged in the Complaint evince

that the Company knew or had reason to believe, at the time the Prospectus and registration

statement were filed, that the statement was untrue."  *Coronel*, 2009 WL 174656 at *13.  The

Court rejected plaintiffs' pleading of falsity through hindsight, holding:

> [A]ny hint of falsity in the initial estimate is belied by the fact that
> insurance reserves established for losses that have been incurred
> but not yet reported to an insurance company are, by their very
> nature, "extremely conjectural, and may need adjustment as time
> passes and their accuracy can be tested in retrospect."

*Zirkin*, 2009 WL 185940, at *11; *see also Coronel*, 2009 WL 174656, at *14 (S.D.N.Y Jan. 26,

2009); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004); *Scibelli*

---

[4]      Although the Complaint alleges that the loss estimates for Hurricane Rita were materially false
and misleading, the PPM only stated that "net losses related to Hurricane Rita will be
substantially less then our estimated losses from Hurricane Katrina," (PPM at 2.), which was true.

*v. Roth*, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000). For these same

reasons, the loss estimates contained in the PPM were not untrue statements of material fact.

The estimates were inherently prospective in nature, made less than a month after Katrina's

landfall and based upon imperfect information available at the time. The Complaint certainly

does not allege that Defendants knew what actual losses would be as of the date of the PPM but

then went ahead and reported other loss estimates.

   The Complaint also fails to allege that Defendants lacked a legitimate basis for

PXRE's Katrina loss estimates. The Complaint cites two September 21, 2005 newspaper articles

for the proposition that PXRE "knew that . . . river flooding would more than likely not be

excluded from coverage since the damage was the result of structural defects in the walls of the

levees and not from storm waters overtopping the levees."[5]  (Compl. ¶ 61.) The two articles,

however, actually establish that the conclusion that damages for river flooding were the result of

overflowing storm waters was consistent with the explanation provided at the time by the federal

government. The *Washington Post* article stated that the official explanation provided by the

Army Corps. of Engineers was that "storm surges overtopped the concrete flood walls." (Ex. F.)

The *New York Times* article reiterated the official assessment that it was the brute force of the

storm rather than human negligence that caused the breach. (Ex. G.)

   The allegation that "most" of PXRE's competitors used RMS is not only too

vague to permit any inference that the Company lacked a basis for its loss modeling, *see In re*

*PXRE*, No. 06 Civ. 3410 (RJS), 2009 WL 539864, at *25-26 (S.D.N.Y. Mar. 4, 2009), but also,

on its face, concedes that at least some other reinsurance companies did not utilize RMS's

estimates. The allegation that a contract by contract analysis (if even possible at the time)

---

[5]  These same two articles were referenced in the consolidated amended class action complaint in
the Class Case, but were dropped from the PSAC after Defendants filed their motion to dismiss.

"would have" provided a more accurate estimate of the Company's Katrina losses, (Compl. ¶ 60), is simply a conclusory speculation. The Complaint does not allege what estimates such an analysis would have yielded.

The Complaint also alleges that the PPM's Katrina loss estimates were materially false and misleading because, "given the Company's representations that it was being very conservative in its estimates, it should have included loss estimates for flooding damage . . . but it did not." (*Id.* ¶ 57.) The Complaint, however, does not identify any statement in the PPM stating that PXRE was being "very conservative" in its Katrina estimates. This allegation is therefore irrelevant to Plaintiffs' Section 12(a)(2) claims.

### 2. The PPM Properly Disclosed The Company's Loss Estimating Methodology

The PPM did not, as Plaintiffs allege (Compl. ¶¶ 55, 57-62, 64), omit any material facts concerning PXRE's loss estimating methodology.  To the contrary, the PPM specifically described how PXRE calculated its Katrina loss estimates, stating that its calculation was based on "industry loss estimates in the range of $30 billion to $40 billion," "modeling, a review of exposed reinsurance contracts and discussions with certain clients."  (PPM at 1.)  The PPM explained that the calculation of potential loss estimates involved "complex and unique causation and coverage issues, including the appropriate attribution of losses to flood as opposed to other perils such as wind . . . The underlying policies generally contain exclusions for flood damage . . . ."  (*Id.* at 2.)  Plaintiffs were well aware that PXRE did not use RMS's publicly available estimates of industry losses.  (Ex. H.)  Indeed, certain Plaintiffs even discussed with Defendants the Company's decision to use the AIR estimates instead of RMS estimates. (Compl. ¶¶ 120-21.)

> **3.    The PPM's Statement Concerning Limitations On The Company's Obligation To Pay Claims Was Not a Misstatement**

The Complaint alleges that the PPM's nondescript statement that policies issued by PXRE had "aggregate limits" and the Company's obligation to pay claims was "limited to a specific aggregate amount" was untrue.  (Compl. ¶ 52.)  The Complaint, however, fails to identify a single policy issued by PXRE that lacked an aggregate limit.  Nor does the Complaint identify an aggregate PXRE policy coverage amount for the New Orleans area that was exceeded as a result of Katrina.  Absent such allegations, there is no basis to infer from the Complaint that the statement was not true.  The Complaint attempts to plead falsity by merging alleged oral statements concerning PXRE's maximum exposure with a highly generalized statement in the PPM regarding policy limits.  But the PPM nowhere states PXRE's maximum Katrina exposure.  The PPM only contains estimates, and makes clear that those estimates could increase in the future.  (PPM at 1, 2, 17-20.)

> **C.    The Complaint Fails To Allege Facts Giving Rise To A Strong Inference Of Scienter With Respect To The '33 Act Claim**

Where a plaintiff's Section 12(a)(2) claims "are premised on allegations of fraud," the complaint is "subject to the pleading requirements of Federal Rule of Civil Procedure 9(b)." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *see Zirkin*, 2009 WL 185940 at *12. Here, the Complaint alleges a claim for common law fraud based upon statements contained in the PPM (Compl. ¶ 156), and contains numerous allegations that Defendants acted knowingly or recklessly in connection with the alleged misstatements and omissions related to the PPM.  (*See id.* ¶¶ 2, 10, 61, 64).  The '33 Act claim is subject to the pleading requirements of Rule 9(b). *See, e.g., Ladmen,* 2008 WL 4449280, at *11.  Plaintiffs therefore must plead their claims with particularity, alleging, among other things, "facts that give rise to a strong inference of fraudulent

intent." *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 420 (S.D.N.Y. 2007).  With respect to the PPM, the sole basis of the '33 Act Claims, there is nothing new for the Court to decide because the scienter allegations here at best mirror those in the PSAC.  *In re PXRE*, 2009 WL 539864 at *18-32; *compare* (Compl. ¶¶ 2, 7, 54, 57, 59-61, 64) *with* (PSAC ¶¶ 3-4, 81-84, 117.)

### D.   The Alleged Misstatements Are Protected By The Common Law Doctrine Of "Bespeaks Caution"

Under the common law "bespeaks caution" doctrine, "a defendant may not be liable under § 12(a)(2) for misrepresentations . . . if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security."  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004); *Seow Lin v. Interactive Brokers Group*, 574 F. Supp. 2d 408, 419 (S.D.N.Y. 2008).  Here, the PPM contained a litany of cautionary disclaimers advising Plaintiffs of the uncertainty attending PXRE's Katrina loss estimates and prospective exposure.  For example,  the PPM advised Plaintiffs that PXRE's Katrina loss estimates were "subject to a high level of uncertainty arising out of extremely complex and unique causation and coverage issues" and that "[a]ctual losses may vary materially" from PXRE's estimates.  (PPM at 1-2.)  Furthermore, the PPM advised in boldface print that:

> **The unprecedented destruction caused by Hurricane Katrina and Hurricane Rita will produce claims that will have a material adverse effect on our financial position and results of operations.  The uncertainty related to the scope of insured losses caused by Hurricane Katrina may increase the number of claims and may further impact our financial results**

(*Id.* at 17 (emphasis in original).)  The PPM also contained numerous other cautionary disclaimers concerning loss estimates.  (*See also id.* at 1-2, 17-20.)

The *Coronel* and *Zirkin* cases dealt with similar alleged misrepresentations and nearly identical cautionary language.  The Court there concluded that the "bespeaks caution" doctrine precluded plaintiffs' Section 12(a)(2) claims as a matter of law.  *Zirkin*, 2009 WL 185940 at *13; *Coronel*, 2009 WL 174656 at *17-18.  While the Complaint suggests in conclusory fashion that the PPM's cautionary language was ineffective because Defendants "knew" that PXRE's loss estimating methodology was fundamentally flawed, (Compl. ¶ 64), it lacks any specific allegation establishing Defendants' knowledge of any flaw.

## II.    Plaintiffs Fail To State Any '33 Act Claims Against The Individual Defendants

Plaintiffs' Section 12 and 15 claims against the Individual Defendants are time-barred.  The Complaint pleads that Plaintiffs discovered the alleged "untrue statement or the omission" in the PPM no later than February 16, 2006. (Compl. ¶ 137.)  Plaintiffs thus had one year from that date to file a claim against the Individual Defendants pursuant to Sections 12 and 15.  *See* 15 U.S.C. § 77m; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003).  Although the Complaint alleges the existence of a tolling agreement with the Individual Defendants, that agreement is not alleged to have been in place prior to February 14, 2008. (Compl. Preamble.)  Given that more than a year lapsed between February 16, 2006 and February 14, 2008, any claims under Sections 12 and 15 are time-barred.

Plaintiffs' failure to allege any violation of Section 12(a)(2) also provides an additional and independent reason why the Section 15 claim must be dismissed.  *See, e.g., Ladmen*, 2008 WL 4449280, at *18.  The Section 15 claim also fails because the Complaint does not allege any specific culpable participation by any Individual Defendant in connection with the PPM.  *See DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001).

### III.     The Complaint Fails To Allege Common Law Fraud

The pleading requirements for common law fraud under New York law are essentially the same as for a violation of securities fraud under Section 10(b) and Rule 10b-5 and must similarly be pled with the particularity required by Rule 9(b).  *See Nairobi Holdings, Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230, 2004 WL 1124660, at *2 (S.D.N.Y. May 20, 2004);  *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 55 (N.Y. 1999).

The Complaint cites several sources of Defendants' alleged fraudulent statements: the PPM, the Prospectus, and oral statements made by certain of the Individual Defendants to certain of the Plaintiffs.[6]  Plaintiffs' claims based upon the PPM and Prospectus cite virtually identical alleged misstatements and fail for the reasons discussed in Sections I. B, C and D.[7]  The alleged misleading oral statements can be separated into four basic categories.[8]

### A.     Oral Statements Concerning The Maximum Loss Exposure "Formula" Are Not Actionable

The Complaint alleges that beginning in 2004 Defendants led certain Plaintiffs to believe that there was a shorthand "formula" that could be used to calculate PXRE's exposure to any one catastrophic event.  For example, on September 7, 2005, Mr. Radke allegedly stated that PXRE's maximum exposure would be "25% of beginning year capital plus expected earnings for the year." (Compl. ¶ 71.).  On September 28, 2005, Mr. Modin allegedly told the Cannell Funds during a telephone conversation that a "1-in-250 year event should result in a loss of no more

---

[6]     Not all Plaintiffs participated in the same conversations with the Individual Defendants.  For example, no Coast Fund representative participated in any of the alleged conversations.

[7]     The Cannell Funds cannot rely upon statements in the Prospectus because they "executed the documents regarding" the Private Placement before the Prospectus was issued.  (Compl. ¶ 109.)

[8]     The Complaint references a fifth category of statements—those that post-dated the Private Placement.  (See e.g., Compl. ¶¶ 79, 126-29.)  Such statements cannot, as a matter of law, form the basis of a fraud claim because transaction causation is lacking.  *Meyercord v. Curry*, 38 A.D.3d 315, 316 (1st Dep't 2007).

than 20% of capital[,]" but that a "10-15% increase was possible."  (*Id.* ¶ 96.)  The Complaint

alleges that statements such as these were materially misleading because the Company's

"maximum exposure was not limited and that its losses would be much greater than what had

been represented to Plaintiffs."[9]  (*Id.* ¶ 74; *see also* ¶¶ 72, 97.)

### 1.     None Of The Alleged Statements Concerning The Maximum Loss Exposure "Formula" Were False

Statements concerning tentative worst case scenarios, generic references to

maximum loss exposures as a result of "extreme" events and the maximum loss "formula" itself

are all inherently forward-looking.  The Complaint makes this clear, referencing statements by

the Individual Defendants about what they would "expect" to happen, and what losses "should

result" from any one catastrophe.  (Compl. ¶¶ 67, 96.)  It is "axiomatic" that statements relating

to future events are not actionable misrepresentations, unless Defendants did not believe the

accuracy of such statements when they were made.  *See, e.g., Matsumura v. Benihana Nat.

Corp.*, 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008); *In re Salomon Analyst AT&T Litig.*, 350 F.

Supp. 2d 455, 469 (S.D.N.Y. 2004).  Allegations concerning what losses actually resulted from

the Gulf Hurricanes are insufficient to establish the falsity of the "formula."  *See Coronel*, 2009

WL 174656, at *14; *Zirkin*, 2009 WL 185940, at *11.

The Complaint does not specifically allege Defendants' knowledge or awareness

that the "formula" had been historically inaccurate or was inappropriate to use in the context of

Katrina.  Nor does the Complaint allege that Defendants knew what PXRE's actual exposure to

Katrina was at the time they advised Plaintiffs of the "formula."  One conversation concerning

the "formula" took place approximately a year before the storm started to brew, and the other

---

[9]     The Complaint does not attribute to Mr. Hengesbaugh any statements about a "formula" or "maximum exposure," and accordingly no claim can be asserted against him based on such alleged statements.

two conversations took place, respectively, less than two weeks and less than a month after

Katrina's landfall.  (Compl. ¶¶ 71, 73, 96.)

> ### 2.      The Complaint Fails To Allege Scienter Concerning The Maximum Loss Exposure "Formula"

For the same reasons that the Complaint fails to plead falsity, it also fails to

allege scienter concerning the "formula."  *See In re QLT Sec. Litig.,* 312 F. Supp. 2d 526, 534

(S.D.N.Y. 2004) ("[w]ith respect to defendants' exaggeration of market potential for Visudyne,

the Complaint alleges that defendants knew information that was contrary to the alleged

misrepresentations; therefore, 'the falsity and scienter [pleading] requirements are essentially

combined.'") (citation omitted).  Nowhere does the Complaint allege with any specificity that

any of the defendants knew any of their statements regarding anticipated losses were false or that

they recklessly disregarded whether or not they were false.  *See also supra* Section I. C.

> ### 3.      The Complaint Fails To Plead Reasonable Reliance Concerning The Maximum Loss Exposure "Formula"

New York courts recognize the "bespeaks caution" doctrine discussed *supra* at

Section I. D.  *See Ackerman*, 252 A.D.2d at 200.  Given the cautionary language in the PPM, any

reliance upon the loss "formula" was unreasonable.  The PPM specifically warned each of the

Plaintiffs that PXRE's typical loss maximums might not apply to an unprecedented catastrophe

like Katrina: "We have . . . established guidelines for maximum tolerable losses from a single

event or multiple catastrophic events based on historical data.  However, no assurance can be

given that these maximums will not be exceeded by actual losses resulting from Hurricane

Katrina . . . ."  (PPM at 19.)  The advisory was specific about the risk involved, referencing the

Company's guidelines for tolerable losses from a single event.  Plaintiffs were thus on notice that

any oral statements concerning maximum losses might not apply to Katrina and any reliance

upon such oral statements was unreasonable as a matter of law.[10]

### B.    Statements Concerning PXRE's Losses From The Gulf Hurricanes Are Not Actionable

The Complaint alleges that the Individual Defendants made various oral

statements concerning the Company's losses with respect to the Gulf Hurricanes.  For example,

during a September 19, 2005 presentation, the Individual Defendants allegedly stated that

"Hurricanes Katrina and Rita would not ruin PXRE" and that PXRE "is prepared for more or

larger events."  (Compl. ¶ 73; *cf id.* ¶ 71.)  During various telephone conversations, the

Individual Defendants conveyed initial loss estimates for the Gulf Hurricanes and allegedly said

things like, "management [was being] extremely conservative with loss estimates," and the

Company's loss controls had "worked."  (*Id.* ¶¶ 76, 85, 87, 117.)  Mr. Radke also allegedly

advised that losses from Katrina "could not be much worse than industry estimates," and

"investors had nothing to worry about since losses from Katrina were less than they had

previously thought."  (*Id.* ¶¶ 85, 87.)  The Individual Defendants allegedly made various other

statements concerning projected losses resulting from the Gulf Hurricanes, including that losses

for Katrina should not exceed $350 million.  (*Id.* ¶¶ 99, 106, 115.)  Certain of the Individual

Defendants also allegedly discussed the industry-wide loss estimates provided by RMS and AIR.

Mr. Radke allegedly "led [the Royal Funds] to believe that current industry loss estimates were

too high" based on comments regarding the September 11, 2001 terrorist attacks (*id.* ¶ 120), and

Mr. Modin allegedly told the Royal Funds that RMS's low estimates were "ridiculous" while

AIR's estimate of $34 billion was "more realistic."  (*Id.* ¶ 121.)

---

[10]     Reliance upon statements alleged to have been made in 2004 is also unreasonable.

1.    **None Of The Alleged Misstatements Concerning The Gulf Hurricanes Were False**

The alleged misstatements concerning the Gulf Hurricanes were either forward-looking or statements of opinion.  Because the Complaint does not allege specific facts suggesting that the Individual Defendants did not actually believe such statements to be true when they were made, the Complaint fails to sufficiently plead falsity.  *See Matsumura*, 542 F. Supp. 2d at 252; *Salomon*, 350 F. Supp. 2d at 469.

The Complaint does not plead any facts suggesting that the beliefs of the Individual Defendants contradicted their alleged statements.  The Complaint does not provide any suggestion that Defendants believed that the Gulf Hurricanes would ruin PXRE, the Company was not prepared to adequately assess losses, the Company was not conservatively estimating its exposure, or losses would exceed $350 million.  The Complaint also does not allege that the Individual Defendants believed that the decision to use industry estimates provided by AIR rather than those provided by RMS was improper.  The timing of these alleged statements is crucial.  One of the statements was allegedly made before Katrina's landfall, and the others were allegedly made shortly thereafter.  (Compl. ¶¶ 38-39, 67, 70-71.)  That the Company's actual losses were in excess of preliminary projections and that the Company's estimating methodology did not accurately project its losses is unremarkable given Katrina's unprecedented destruction and the limited information available at the time.

The Complaint also cites as false and misleading several statements that were manifestly true.  For example, there was nothing false about Mr. Radke and Mr. Modin's alleged statement on September 7, 2005 that it was "too early to provide a meaningful estimate or range" for Katrina.  (*Id.* ¶ 113.)  The Complaint alleges in conclusory fashion that PXRE had "already conducted or had the ability to conduct a contract by contract analysis of the Company's

exposure to the New Orleans area." (*Id.* ¶ 114.) But the Complaint does not allege any specifics concerning any contract by contract analysis that the Company had performed and pleads no basis to infer that any estimate resulting from such an analysis would be a better or more "meaningful estimate or range."

### 2. The Complaint Fails To Allege Scienter Concerning Statements Relating To The Gulf Hurricanes

The Complaint fails to allege scienter for the same reasons that it fails to allege falsity. At no point does the Complaint allege facts creating a strong inference that any of the Defendants either knew their statements concerning the Gulf Hurricanes were false or made those statements recklessly. *See also supra* Sections I. C, III. B. 1(b).

### 3. The Complaint Fails To Allege Reasonable Reliance On Statements Relating To The Gulf Hurricanes

Reliance upon any of the allegedly false statements concerning PXRE's losses from the Gulf Hurricanes would be unreasonable given their forward-looking nature and the cautionary disclaimers contained in the PPM. (*See* PPM at 1-2, 17-20.) Further, several of the alleged false statements are too vague for any investor, much less a sophisticated one, to reasonably rely upon. *See Ederer v. Gursky*, 35 A.D. 3d 166, 167-168 (1st Dep't 2006); (*see, e.g.,* Compl. ¶¶ 71, 87.)

### C. Statements Concerning The Impact Of A Ratings Agency Downgrade Are Not Actionable

The Complaint contains limited allegations of misrepresentations concerning the potential impact of a ratings agency downgrade on PXRE. (Compl. ¶¶ 15, 76, 102, 137, 141.) The Complaint cites a September 29, 2005 conference call where Mr. Radke advised the Endicott Funds that PXRE "'would not be materially impacted'" by an "S&P downgrade to A-." (*Id.* ¶ 76.) The Complaint, however, does not allege that the statement was false or that an A-

rating would materially impact PXRE.  Rather, the Complaint concedes that "[r]atings of at least 'A-'" were "crucial" and that only a rating below that level was problematic to the business.  (*Id.* ¶ 138.)

The Complaint also cites a September 28, 2005 conference call where Mr. Modin allegedly misled the Cannell Funds concerning the impact of a ratings agency downgrade.  (*Id.* ¶¶ 15, 102.)  The Complaint alleges Mr. Modin advised the Cannell funds that any potential downgrade from the Company's alleged "A-" credit rating would be a "non-event."  (*Id.* ¶ 102.)  It is unclear, however, how Plaintiffs could have been misled about the impact of a downgrade because they also allege that Mr. Modin advised that he "did not anticipate any cancellations unless the Company's rating was downgraded below A-."  (*Id.* ¶ 102.)  By the Complaint's own allegations, therefore, a downgrade below A- would not be a non-event.  Indeed, the PPM— dated that same day—states that any downgrade to a "B" category "could result in a substantial loss of business."  (PPM at 19.)

### D.     Statements Concerning PXRE's Business Prospects Are Not Actionable

The Complaint alleges that certain of the Individual Defendants allegedly made statements like, the Company "will do great," "had been in business a long time" and "had all of the procedures in place to ensure that it survived any big storms."  (Compl. ¶¶ 69-70, 85, 87, 104.)  Such statements reflect nothing more than the Individual Defendants' opinion or general corporate optimism, are mere puffery, and are not actionable in fraud or otherwise.  *Glassman v. Catli*, 111 A.D.2d 744, 745-46 (2d Dep't 1985); *Rombach*, 355 F.3d at 174; *In re FBR*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008).

**IV.      The Complaint Fails To Plead A Claim For Negligent Misrepresentation**

As Plaintiffs have effectively conceded to the Court, the negligent

misrepresentation claims are preempted by the Martin Act.  Even if that were not the case,

Plaintiffs' claims would still fail because the allegations do not satisfy the elements of a

negligent misrepresentation claim.

**A.      Plaintiffs' Negligent Misrepresentation Claims Are Preempted By The Martin Act**

The Martin Act, N.Y. Gen. Bus. Law § 352 *et seq*, preempts common law claims

for negligent misrepresentation brought under New York law where the underlying transaction

was "within or from" New York.  *See, e.g., Heller v. Goldin*, 590 F. Supp. 2d 603, 610-11

(S.D.N.Y. 2008).  A transaction is "within or from" New York for purposes of Martin Act

preemption "if a plaintiff alleges that a 'substantial portion of the events' giving rise to a claim

occurred in New York."  *Heller*, 590 F. Supp. 2d at 610, n. 9.

The Complaint clearly alleges that a "substantial portion of the events" giving rise

to Plaintiffs' claims occurred in New York.  The Complaint alleged that the "acts and conduct

complained of . . . occurred in substantial part" in the Southern District of New York (Compl. ¶

22), that the Private Placement was coordinated by Goldman Sachs, an investment bank based in

New York (*Id.* ¶ 50), and cites meetings and conferences occurring in New York (*Id.* ¶¶ 13, 69,

71, 83, 113).  *See Heller*, 590 F. Supp. 2d at 610, n. 9; *State v. Samaritan Asset Mgmt Servs.,*

*Inc.*, 874 N.Y.S.2d 698, 704 (N.Y. Sup. Ct. 2008).  Moreover, Plaintiffs in bringing this suit rely

upon a PPM that contains a New York governing law provision.  (PPM at 14.)

One of the changes made when Plaintiffs amended their original complaint was to

add to what is now paragraph 22 the words "and in California."   In the first complaint, the

sentence claimed that the acts and conduct at issue only occurred in substantial part in New York

alone.  Whether or not a few alleged acts took place (in part) in California for one of the Plaintiffs does not alter the fact that the Complaint concedes that the acts and conduct occurred in substantial part in New York.

The Complaint suggests that Cannell Funds representatives participated in four telephone calls from San Francisco and that the Cannell Funds executed the Private Placement documents in San Francisco.  (Compl. ¶¶ 94, 96, 108, 109.)  However, allegations that some events related to a particular claim took place outside of New York do not take the claim outside the Martin Act's preemptive grasp.  *See Sedona Corp. v. Landenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005) (finding Martin Act preempted plaintiff's common law fraud claim despite allegations that misrepresentations were allegedly made at plaintiff's Pennsylvania office).

### B.    The Complaint Fails To Plead Any False Statement Of Existing Fact

To state a claim for negligent misrepresentation, a complaint must allege that the defendant, among other things, made a false statement.  *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  It is well settled that, "[a]s in the case of fraud, an alleged misrepresentation must be factual and not 'promissory or related to future events.'"  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004); *Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523, 539 (S.D.N.Y. 2007); *Hydro*, 227 F.3d at 21; *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 74 (1st Dep't 2000).  For the reasons discussed above in Sections II and III, none of the alleged statements were false when they were made.

**C.** **The Complaint Fails To Plead Any False Statement That Defendants Knew Or Should Have Known Was Incorrect**

Consistent with Rule 9(b)'s requirements, the Complaint must allege specific facts establishing that Defendants knew or should have known that the alleged false statements were incorrect. *See Henneberry*, 532 F. Supp. 2d at 540; *Mia Shoes, Inc. v. Republic Factors Corp.*, No. 96 Civ. 7974, 1997 WL 525401, at * 3 (S.D.N.Y. Aug. 21, 1997). For the reasons discussed above in Sections II and III, the Complaint fails to plead any specific facts suggesting that Defendants should have known that their estimates were incorrect or their estimating methodology was flawed.

**D.** **The Complaint Fails To Plead Any Fiduciary Relationship Between Plaintiffs And Defendants**

To state a claim for negligent misrepresentation, a complaint must also allege a special or fiduciary "relationship of trust or confidence between the parties." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995). It is well-settled under New York law that, "by their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York courts as fiduciary." *Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 465-66, 2008 WL 3842899, at *3 (2d Cir. 2008).

Rather than plead any special or fiduciary relationship between the parties, the Complaint purely pleads indicia of an arms length transaction. The Complaint alleges that Plaintiffs were "sophisticated investors" that "directly contact[ed] the Company to inquire about participating in any securities offering." (Compl. ¶¶ 43, 93.) Moreover, the PPM specifically directs that "each prospective purchaser will make its own independent investigation into the merits and risks of the proposed investment." (PPM at (i).) Absent any allegation of a special or

fiduciary relationship the negligent misrepresentation claim fails as a matter of law.  *See Eternity*, 375 F.3d at 187-89; *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1st Dep't 1996)).

###### E.      The Complaint Fails To Allege Reasonable Reliance

For the reasons discussed in Section III, any reliance upon any of the alleged oral statements was unreasonable.

#### CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Complaint must be dismissed in its entirety and with prejudice.

Dated: New York, New York
　　　　May 6, 2009

SIMPSON THACHER & BARTLETT LLP

By:   /s/ Bruce D. Angiolillo
Bruce D. Angiolillo
Jonathan K. Youngwood
John C. Briody
425 Lexington Avenue
New York, New York  10017-3954
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502
**Attorneys for PXRE Group, Ltd and Argo Group International Holdings Ltd.**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   /s/ Brad S. Karp
Brad S. Karp
Jonathan H. Hurwitz
Joshua D. Anders
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 492-0316
**Attorneys for Guy D. Hengesbaugh**

DEBEVOISE & PLIMPTON LLP

By:   /s/ Jonathan R. Tuttle
Jonathan R. Tuttle (admitted *pro hac vice*)
Scott N. Auby
David S. Karp
555 13th St., N.W.
Washington, D.C. 20004
Telephone: (202) 383-2000
Facsimile:  (202) 383-8118
**Attorneys for Jeffrey L. Radke**

SEWARD & KISSEL LLP

By:   /s/ M. William Munno
M. William Munno
Justin M. Garbaccio
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile:  (212) 480-8421
**Attorneys for John M. Modin**